1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RANDALL L. ESSLINGER,

                              Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

Case No. 3:09-cv-05760-KLS

ORDER AFFIRMING DEFENDANT'S
DECISION TO DENY BENEFITS

        Plaintiff has brought this matter for judicial review of defendant's denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  This

matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v.

Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the

Court hereby finds that for the reasons set forth below, defendant's decision to deny benefits is

affirmed.

                        FACTUAL AND PROCEDURAL HISTORY

        On December 29, 1999, plaintiff filed applications for disability insurance and SSI

benefits, alleging disability as of December 7, 1999, due to back problems, lung disease, chronic

dermatitis, alcoholism, drug addiction, Hepatitis C, hearing loss, frost bite in his feet, problems

with his hands and knees, being manic, and breathing difficulties.  See Tr. 66-68, 96, 113, 620.

Both applications were denied on initial review.  See Tr. 20, 39, 620.  A hearing was held before

ORDER - 1

an administrative law judge ("ALJ") on May 24, 2002, at which plaintiff, choosing to proceed without legal counsel, appeared and testified. See Tr. 542-93.

On January 28, 2004, the ALJ issued a decision in which plaintiff was determined to be not disabled. See Tr. 20-32. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on October 15, 2004, making the ALJ's decision defendant's final decision. See Tr. 7; see also 20 C.F.R. § 404.981, § 416.1481. Plaintiff appealed defendant's decision to this Court, which upon the stipulation of both parties, remanded the matter to defendant on July 21, 2005, to conduct further administrative proceedings. See Tr. 682-83. Pursuant to the Court's order, the Appeals Council vacated the ALJ's decision, remanding the matter to a different ALJ to conduct the additional administrative proceedings. See Tr. 693.

A second hearing was held before the new ALJ on February 13, 2007, at which plaintiff, this time represented by counsel, appeared and testified, as did a medical expert and a vocational expert. See Tr. 829-99. On May 16, 2007, that ALJ also determined plaintiff to be not disabled. See Tr. 620-37. On November 18, 2009, the Appeals Council again denied plaintiff's request for review of the ALJ's decision, making it defendant's final decision. See Tr. 594; see also 20 C.F.R. § 404.981, § 416.1481.

On December 8, 2009, plaintiff filed a complaint in this Court seeking judicial review of the second ALJ's decision. See (ECF #1-#3). The administrative record was filed with the Court on February 23, 2010. See (ECF #11). The parties have completed their briefing, and thus this matter is now ripe for judicial review and a decision by the Court.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred in: (1) failing to employ the proper technique for evaluating his mental impairments; (2)

ORDER - 2

improperly assessing the effects of his substance abuse on his alleged disability; (3) evaluating

the medical evidence in the record; (4) assessing his credibility and residual functional capacity;

and (5) finding him to be capable of performing other work existing in significant numbers in the

national economy.  For the reasons set forth below, the Court does not agree that the ALJ erred

in determining plaintiff to be not disabled, and therefore hereby finds that the ALJ's decision be

affirmed.  Although plaintiff requests oral argument in this matter, the Court finds such argument

to be unnecessary here.

DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the

proper legal standards were applied and there is substantial evidence in the record as a whole to

support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767

F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance. See

Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F.

Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational

interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577,

579 (9th Cir. 1984).

I.      The ALJ's Evaluation of Plaintiff's Mental Impairments

At step two of the sequential disability evaluation process, the ALJ must determine if an

impairment is "severe."[1] 20 C.F.R. § 404.1520, § 416.920.  An impairment is "not severe" if it

---

[1] Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

ORDER - 3

does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); see also Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. See Smolen, 80 F.3d at 1290.

In this case, the ALJ found plaintiff had severe impairments consisting of Hepatitis C, degenerative disc disease of the lumbar spine, Raynaud's syndrome, hearing loss, a bipolar disorder, and a substance abuse disorder. See Tr. 623. In addition, the ALJ found none of the following alleged impairments to be severe: carpal tunnel syndrome, a left shoulder injury, an attention deficit hyperactivity disorder, a personality disorder, a posttraumatic stress disorder, and paranoid schizophrenia. See Tr. 623-25. Plaintiff argues, however, that in so finding the ALJ failed to employ the required proper technique in determining the severity of his alleged mental impairments. The Court disagrees.

To evaluate the severity of a claimant's mental impairments, defendant must "follow a special technique at each level in the administrative review process." 20 C.F.R. § 404.1520a(a) §

ORDER - 4

416.920a(a).  Under this technique, defendant first determines whether the claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b)(1), § 416.920a(b)(1).  If the claimant has such an impairment, defendant rates the "degree of functional limitation" resulting from that impairment. 20 C.F.R. § 404.1520a(b)(2), § 416.920a(b)(2).

Rating the degree of functional limitation involves consideration of four functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  See 20 C.F.R. § 404.1520a(c), § 416.920a(c).  If a claimant's degree of limitation in the first three areas is rated "none" or "mild" and "none" in the fourth area, then the claimant's mental impairment generally is considered not severe, unless evidence in the record otherwise indicates there is more than a minimal limitation in the claimant's ability to do basic work activities.  See 20 C.F.R. § 404.1520a(d)(1), § 404.1520a(d)(1).  Next, if the impairment is found to be severe, defendant determines if it meets or equals the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. See § 404.1520a(d)(2), § 416.920a(d)(2). If it does not, defendant then assesses the claimant's residual functional capacity.  See 20 C.F.R. § 404.1520a(d)(3), § 416.920a(d)(3).

At the initial and reconsideration levels of the administrative review process, "a standard document" is completed to record how the above technique was applied.  See 20 C.F.R. § 404.1520a(e), § 416.920a(e).  At the ALJ hearing level, though, documentation of the technique is done in the decision itself.  Id.  Plaintiff asserts that in this case the ALJ did not incorporate in his assessment of plaintiff's limitations or in the hypothetical question he posed to the vocational expert at the second hearing, any information as to the degree of mental functional limitation as required by the above special technique.  However, plaintiff fundamentally misapprehends the nature of that technique.

ORDER - 5

First, this special technique is, as just discussed, applied for the purpose of determining the severity of a claimant's mental impairments.  This, the ALJ did not fail to do, as he expressly found plaintiff had a mild limitation in his activities of daily living, mild difficulties in his social functioning, moderate difficulties in his concentration, persistence or pace, and no episodes of decompensation, and used that finding to make not only his severity determination at step two, but his determination at step three that none of his impairments met or medically equaled the criteria of a listed impairment.[2]  See Tr. 625.  Second, as discussed in further detail below, the ALJ went on to address more specifically the mental functional limitations he found the evidence in the record supported in terms of plaintiff's residual functional capacity prior to steps four and five.  Accordingly, no error in applying the above special technique was made.

II.   The ALJ's Treatment of Plaintiff's History of Substance Abuse

Plaintiff argues the ALJ committed error by referencing his history of drug and alcohol abuse, and then relying at least in part on that history to find plaintiff's mental impairments and limitations to be not as severe as alleged or as found by some of the medical opinion sources in the record.  Specifically, plaintiff asserts that before assessing all of his impairments, including his history of drug and alcohol abuse as the ALJ did here, the process for determining whether such history of abuse was material to the other diagnosed mental impairments should have been employed.  As pointed out by defendant, however, plaintiff gets it backward.

What the law in this area provides is that a claimant may not be found <u>disabled</u> if either alcoholism or drug addiction would be "a contributing factor material to" that determination.

___

[2] At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or medically equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments does meet or medically equal a listed impairment, then he or she is deemed disabled. Id. The burden of proof, however, is on the claimant to establish his or her impairments meet or medically equal any of those contained in the Listings. Tacket, 180 F.3d at 1098.  In this case, plaintiff has not challenged the propriety of the ALJ's step three determination.

ORDER - 6

Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)); see also 20 C.F.R. § 404.1535(a), § 416.935(a)).  To find whether a claimant's alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of alcoholism or drug addiction." Bustamante, 262 F.3d at 955 (emphasis added).  If the claimant is found not disabled even when considering that impact, "the claimant is not entitled to benefits." Id.

On the other hand, it is only when the claimant is found disabled "and there is 'medical evidence of drug addiction or alcoholism,'" that the ALJ is "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. § 404.1535, § 416.935).  In that case, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations are found disabling, drug addiction or alcoholism then is "not material to the disability, and the claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).  Because the ALJ did not find plaintiff to be disabled in this case, he did not have to separate out the drug and alcohol abuse history prior to determining its impact on plaintiff's other impairments.

III.    The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at

all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. See Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v.

ORDER - 8

Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record."  Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

       A.       The Medical Expert at the Second Hearing

At the second hearing, the ALJ stated that one of the examining medical opinion sources in the record, Douglas G. Smith, M.D., appeared "at hearings quite often," and that he found him to be "very credible."  Tr. 889.  Plaintiff argues that despite this statement concerning credibility, the ALJ nevertheless disregarded Dr. Smith's opinion regarding his physical residual functional capacity.  That argument is without merit.  First, the ALJ did not disregard Dr. Smith's opinion, but rather specifically addressed it as follows:

> In November 2002, Dr. Smith opined that the claimant could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk at least two hours in an eight-hour workday, and sit less than six hours in an eight-hour workday.  He indicated that the claimant needed to periodically alternate between sitting and standing.  He indicated that the claimant could occasionally climb stairs, kneel, crouch, or crawl, but should never stoop.  He opined that the claimant could frequently perform handling, fingering, and feeling and could constantly perform reaching.  He stated that the claimant needed to wear a hearing aid for crowds or background noise problems.  He indicated that the claimant had limitations with temperature extremes and vibrations (Exhibit 27F/13).
>
> The undersigned gives significant weight to Dr. Smith's opinion because it is based on a thorough physical examination.  However, given the fairly normal physical examination with Drs. Smith and [Loretta L.] Lee[, M.D.], the fairly benign MRIs of the lumbar spine, and the conservative treatment and minimal follow-up for back pain, the undersigned finds that the claimant can stand, walk, and sit six hours in an eight-hour workday.

Tr. 632-33.

Second, there is no inconsistency necessarily in considering a medical opinion source to

ORDER - 9

be credible on the whole, but then finding a particular opinion of that same medical source to be not fully credible for legitimate reasons specifically related to that opinion.  Third, the ALJ did provide valid reasons for not fully adopting the opinion of Dr. Smith, as a medical opinion is not required to be accepted if it is inadequately supported by clinical findings or by the record as a whole. See Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149; see also Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancies between opinion source's functional assessment and that source's clinical notes, recorded observations and other comments regarding claimants capabilities is clear and convincing reason for not relying on that assessment); see also Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).

Plaintiff argues the ALJ did not explain "the basis of his medical expertise so as to allow him to come to a different conclusion" regarding his functional limitations than that obtained by Dr. Smith. (ECF #16, p. 15).  It is true that an ALJ may not base his or her decision on "his [or her] own [medical] expertise." Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of objective medical findings without supporting medical expert testimony); see also Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for that of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion).

The ALJ, however, is free to choose "between properly submitted medical opinions," or, as here, between a medical opinion and other objective medical evidence in the record. Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978).  Indeed, this is the essence of what an ALJ does in Social Security disability cases. See Reddick, 157 F.3d at 722 (it is solely responsibility of ALJ to determine credibility and resolve ambiguities and conflicts in medical evidence); Sample, 694

ORDER - 10

F.2d at 642 (same).  Thus, contrary to plaintiff's assertion that the ALJ improperly substituted his own lay opinion for the expertise of Dr. Smith, the ALJ merely weighed the conflicting medical evidence in the record and came to a rational conclusion in regard thereto.

B.     Dr. Takaro and Dr. Subramaniam

In regard to the physical functional capacity assessments provided by Timothy K. Takaro, M.D., a treating physician, and Satish Subramanian, M.D., a consultative, examining physician, the ALJ found in relevant part as follows:

> In October 2003, Dr. Takaro opined that the claimant could work an eight-hour day and perform many physical demands.  He stated that the claimant should not use vibrating equipment for any period longer than 10 to 15 minutes, should wear gloves in cold environments, and should avoid repetitive motions using the hands (Exhibit AC1/2).
>
> The undersigned gives some weight to Dr. Takaro, but find [sic] that the claimant can frequently handle, finger, and feel with both hands.  The claimant has been able to control his Raynaud's disease and, other than a few complaints of occasional numbness in his left hand in March 2006, physical examination records reflect few problems with the hands or wrists.
>
> In March 2006, Dr. Subramanian opined that the claimant could not work in a position that involved exposure to an extreme cold environment or required the use of vibratory tools.  He further opined that the claimant could not work in a position that involved frequent motion at the wrist or sustained awkward postures with high grip or pinch force.  He based his restrictions on the claimant's Raynaud's syndrome and carpal tunnel syndrome.
>
> The undersigned gives partial weight to Dr. Subramanian's opinion.  The undersigned accepts Dr. Subramanian's opinion that the claimant should avoid extreme cold environment and vibratory tools because the restrictions are consistent with that assessed by Dr. Takaro in October 2003 and Dr. Smith in November 2002.  However, the undersigned rejects Dr. Subramanian's other manipulative limitations.  First, as discussed above, the undersigned finds that the claimant's carpal tunnel syndrome is "non-severe."  The claimant denied having any problems with his right hand and admitted to Dr. Subramanian that his left wrist acted up only occasionally and was not problematic.  Additionally, during earlier examinations, neither Dr. Smith nor Dr. Takaro assessed any limitation in high grip or pitch force.  Second, Dr. Subramanian's assessment is not supported by his examination notes.  The claimant had normal sensation and two point discrimination in both hands.

ORDER - 11

He had 5/5 grip strength in both upper extremities and 5/5 muscle strength in all muscle groups.  Third, other than this March 2006 examination, the record reflects no other significant problems with the claimant's hands or wrists.

Tr. 633.

While plaintiff asserts the ALJ gave no reasons for rejecting the opinions of Dr. Takaro and Dr. Subramanian, clearly this is not the case here given the ALJ's express findings set forth above.  In addition, these findings are both specific and legitimate.  See Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149; Bayliss, 427 F.3d at 1216; Weetman, 877 F.2d at 23.  Plaintiff further asserts findings from Dr. Takaro dated December 18, 2001 – in which Dr. Takaro notes diminished sensation in the hands, reduced reflexes in the arms, some left-handed weakness, and more-likely-than-not occupationally-induced Raynaud's syndrome (see Tr. 358-59) – provide additional support for Dr. Subraminian's opinion.  But none of these findings are sufficient to overcome the largely benign findings Dr. Subraminian obtained much more recently in March 2006, noted by the ALJ and properly relied on by him here to discount that medical source's functional assessment.[3]  See Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001) (physician's most recent medical reports are highly probative).

C.    Dr. Lee

An evaluation report was completed by Dr. Lee following an examination she performed in early November 2002, which the ALJ addressed as follows:

---

[3] Plaintiff suggests the ALJ further erred in failing to mention in his decision that the evaluation report completed by Dr. Subramanian, was co-signed by Jordan Aaron Firestone, M.D.  See Tr. 790.  But any error on the part of the ALJ here was harmless, given that the same valid reasons the ALJ gave for rejecting the findings contained in that report and attributed to Dr. Subramanian, necessarily would apply to Dr. Firestone as well.  See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).  In addition, Dr. Takaro's statements in early September 2003, that plaintiff had "difficulties with his back," that he had been evaluated by a pain clinic and that his back problem was complicated by the his vocational rehabilitation plan (Tr. 531), provide no real additional basis for overturning the ALJ's findings here, as none of those statements give any indication that the factors noted therein actually have impacted the ability of plaintiff to perform specific work-related limitations.

ORDER - 12

. . . Loretta Lee, M.D., diagnosed recurrent skin infections, unlikely related to pig exposure, chronic low back pain, history of alcoholism, leucopenia likely related to interferon therapy, a hearing deficit, complaints of breathing problems, history of intravenous drug abuse, and history of tobacco abuse. On examination, the claimant had no spinal tenderness to percussion, his strength was 5/5, and his gait was normal. He underwent an exercise treadmill test and demonstrated fairly good exercise tolerance. He exercised for nine minutes and six seconds and attained a maximum heart rate of 117. The test was stopped secondary to back and shoulder pain (Exhibit 30F/7).

Tr. 626. Plaintiff argues the ALJ's finding that he "demonstrated fairly good exercise tolerance" is contrary to the opinion of Dr. Lee. But the ALJ is merely setting forth here the actual findings made by Dr. Lee. That is, Dr. Lee herself described plaintiff as exhibiting "[f]airly good exercise tolerance." Tr. 416. Accordingly, there is no error here.

D.    Dr. McGrath

In his decision, the ALJ noted that in January 2003, Richard W. McGrath, D.O., another treating physician, "wrote a letter, stating that, due to side effects of the Hepatitis C medication and the need for multiple visits during the workweek," plaintiff "was unable to engage in any gainful employment from September 2002 through September 2003." Tr. 633. The ALJ went on to discount Dr. McGrath's opinion, though, because it was "not supported by his treatment notes, which indicate[d] that [plaintiff] was tolerating the interferon treatment fairly well." Id.; see also Tr. 631 (discussing specific portions of record evidencing such tolerance).[4]  Plaintiff once more

---

[4] In particular, the ALJ pointed out in relevant part that:

. . . Although the claimant reported experiencing side-effects during interferon treatment, medical records from Richard McGrath, D.O., generally indicate that he tolerated the treatment. For instance, on October 23, 2002, he complained of fatigue, headaches, and loss of appetite after interferon injections, but acknowledged that he then felt better later. On October 30, 2002, he stated that he was doing okay. On November 13, 2002, he stated that [sic] felt good with limited lethargy. On November 20, 2002, he reported feeling pretty good. On December 12, 2002, he denied significant symptoms except for headaches, which Advil seemed to help. On January 2, 2003, Dr. McGrath noted that the claimant experienced two days of malaise per week, but felt good otherwise. On February 19, 2003, the claimant reported feeling good. He stated that he experienced some malaise, but indicated that it was not limiting. On April 2, 2003, he described having fatigue and arthralgias for two or three days after an injection, but he was doing well at the time. On April 23, 2002, he reported

ORDER - 13

argues that in so concluding, the ALJ improperly substituted his own lay opinion for the medical expertise of Dr. McGrath.

The Court, however, already has rejected this argument with respect to Dr. Smith above, and for the same reasons is rejected here as well.  Plaintiff further contests the finding of the ALJ that Dr. McGrath's opinion is not supported by his treatment notes, asserting that "even lay people know that for many [people,] back pain is a daily problem that may not be susceptible to medical treatment." (ECF #16, p. 19).  But plaintiff's reliance on his own perception of what lay people in general "know" is wholly insufficient to overcome an ALJ determination supported by substantial evidence in the record, as it is here.  Lastly, plaintiff asserts the record "is replete" with references to his Hepatitis C. See id.  Case law is clear, though, that the mere existence of a medical condition or impairment is not sufficient to establish disability.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).

    E.    Dr. Hwang and Dr. Price

Plaintiff challenges as well the ALJ's evaluation of the opinions of the following two consultative, examining physicians:

> In March 2006, Dr. [Andrew S.] Hwang[, M.D.,] opined that [the] claimant would not be able to handle job-related stress with poorly controlled depressive symptoms.  He noted, however, that the comorbidity of chemical dependency with depression usually led to poor treatment response in general and that the claimant's chemical dependency had to be treated to make a significant impact to his psychiatric difficulties (Exhibit 39F).

> The undersigned discounts Dr. Hwang's opinion and his GAF [global

---

feeling good and denied any problems.  On June 4, 2003, he stated that he was doing well. On June 18, 2003, he denied malaise and lethargy.  On June 25, 2003, he complained of lethargy, but denied malaise.  On July 9, 2003, he had no documented problems (Exhibit 31F).

Id.

ORDER - 14

assessment of functioning] score of 40.[5]  First, the claimant admitted that he was not taking his Celexa, which had helped his depression in the past.  Second, Dr. Hwang noted that the claimant had drinking problems and that chemical dependency had a significant impact on the claimant's psychiatric conditions.  Third, about three days before his evaluation with Dr. Hwang, the claimant appeared at the ER with possible paranoid ideation and reported drinking and using cocaine one week ago.  The claimant's noncompliance with medication and his substance abuse make it difficulty [sic] to clearly determine the actual severity of the claimant's symptoms.  Finally, the undersigned further rejects Dr. Hwang's opinion to the extent he relies on the claimant's subjective complaints.  As noted above, the claimant is not fully credible.

In June 2006, Dr. [Richard] Price[, M.D.,] stated that the claimant appeared to be stabilized with a single antidepressant.  Though the claimant consumed less alcohol than he did in his heaviest drinking periods, Dr. Price noted that he continued to drink fairly heavily.  He opined that the claimant's mental symptoms might interfere with any kind of work that required consistent emotional stability and sobriety.  He opined that the claimant had the ability to perform simple, repetitive tasks and could probably perform detailed and complex tasks.  He imagined that the claimant would have some difficulty accepting instructions from supervisors and interacting with coworkers and the public.  He noted that the claimant seemed to be a strongly individualistic and independent individual.  He opined that, from a mental standpoint, the claimant could possibly have difficulty performing work activities consistently and maintaining regular attendance in the workplace.  Dr. Price also filled out a medical source statement, indicating that the claimant was not impaired in his ability to understand, remember, and carry out instructions.  He opined that the claimant was moderately limited in his ability to interact appropriately with supervisors, coworkers, and the public.  He opined that the claimant was moderately limited in has [sic] ability to respond to work pressures in a usual work setting.  He noted that while the claimant's "alcohol dependence contributed to his disability, physical conditions and other mental conditions play a much greater role in his disability" (Exhibit 34F).

For the similar reasons used above for rejecting Dr. Hwang's opinion, the undersigned discounts Dr. Price's June 2006 opinion.  Prior to October 2005, when the claimant was abstinent and taking Celexa on and off, the claimant was functioning fairly well.  The claimant had a fairly normal mental status

---

[5] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).  "A GAF score of 31-40 is extremely low, and 'indicates . . . major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.'" Salazar v. Barnhart, 468 F.3d 615, 624 n.4 (10th Cir. 2006) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32).

ORDER - 15

examination in April 2004 with Dr. [Katharine] Brzezinski-Stein[, Ph.D.,] and the medical records from Dr. McGrath in 2002 and 2003 indicate few complaints of depression or mania.  The undersigned finds that the limitations assessed by Dr. Price in social functioning are inconsistent with the claimant's reported activities and with the objective observations of his examiners.

Tr. 634-35.

Plaintiff argues that it was legally improper for the ALJ to reject Dr. Hwang's opinion on the basis that he was not taking his medications and that his substance abuse made it difficult to clearly determine the actual severity of his symptoms.  While it may be, as plaintiff also argues, that one of the classic features of a bipolar disorder is non-compliance with medications, he does not point to any evidence in the record that this is the reason he was not taking them.  In addition, the fact that plaintiff previously had reported improvement on his medication certainly does call into question the extremely low GAF score assessed by Dr. Hwang.  The Court, furthermore, has already rejected plaintiff's contention that the ALJ improperly addressed his history of substance abuse, and thus this was a valid basis for discounting Dr. Hwang's opinion as well.

Lastly with respect to Dr. Hwang, it does appear that he may have relied to a significant extent on plaintiff's own subjective report concerning his functioning, given the lengthy history detailed by Dr. Hwang and the fairly normal mental status examination findings he obtained.  See Tr. 784-86.  An ALJ may discount a physician's opinion premised on the claimant's subjective complaints, where the record supports the ALJ in discounting the claimant's credibility, as it does in this case as explained in further detail below.  See Tonapetyan, 242 F.3d at 1149; see also Morgan, 169 F.3d at 601 (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted).

In regard to Dr. Price, plaintiff argues it was improper for the ALJ to discount his opinion

ORDER - 16

based on the medical records from Dr. McGrath, because Dr. McGrath's focused on treating him for his Hepatitis C problem, and not his mental health issues.  The Court agrees, as the treatment notes from Dr. McGrath do indicate he focused primarily on plaintiff's Hepatitis C problem.  See Tr. 342, 346, 438-40, 447, 452, 454-55, 457, 459.  On the other hand, as the ALJ also noted, the limitations assessed by Dr. Price are inconsistent with the objective clinical findings contained in the record, including the mental status examination discussed in greater detail below, concerning plaintiff's mental presentation.  In addition, because, as also discussed in greater detail below in regard to the ALJ's assessment of plaintiff's credibility, no error was committed by the ALJ in rejecting Dr. Price's opinion in part on the basis that it was inconsistent with plaintiff's reported daily activities.  See Morgan, 169 F.3d at 601-02 (upholding rejection of physician's conclusion that claimant suffered from marked limitations in part based on reported activities of daily living, contradicted that conclusion); Magallanes v. Bowen, 881 F.2d 747, 754 (9th Cir. 1989) (ALJ properly rejected opinion of physician in part on basis that it conflicted with plaintiff's subjective pain complaints).

> F.      Dr. Brzezinski-Stein

In regard to Dr. Brzezinski-Stein, a consultative, examining physician, the ALJ found as follows:

> . . . Dr. Brzezinski-Stein, in April 2004, noted that, despite the claimant's impairments, he exhibited a very good fund of knowledge and capacity for verbal reasoning.  She stated that, although the claimant expressed dislike for people, he was nonetheless courteous and well mannered.  She opined that the claimant's prognosis for returning to full-time competitive employment was fair.  Given that his most recent hypomanic episode occurred almost six months ago, she stated that his prognosis could be upgraded to good with adequate treatment (Exhibit 32F/6).

> The undersigned gives some weight to Dr. Brzezinski-Stein's opinion.  The undersigned finds that the claimant was capable of competitive employment at the time of April 2004 evaluation.  The claimant was abstinent.  He performed

> fairly well on the mental status examination, including completing serial 3's and a 3-step command.  He was independent in his activities of basic self and homecare, attended church and AA meetings, interacted with a few friends on a regular basis, and was cooperative with the examiner.

Tr. 634.  Plaintiff argues the ALJ fails to explain why he came to a different conclusion from Dr. Brzezinski-Stein, despite referring to the same clinical findings used by her.  Plaintiff's argument here appears to be the same one he raised previously concerning the alleged substitution by the ALJ of his own lay opinion for that of the examining source's medical expertise.  Again, though, the ALJ merely properly exercised his responsibility for resolving credibility issues concerning the medical evidence in the record.

G.    Dr. Worrell

The ALJ addressed as follows the opinion of Paul Worrell, M.D., a consultative, non-examining physician, regarding plaintiff's ability to work:

> . . . In December 2000, Dr. Worrell opined that the claimant was disabled because of paranoid schizophrenia and chronic low back pain.  He stated that the claimant needed a sitting job most of the day and needed to be sheltered from overt stress and interaction with the public (Exhibit 17F).

> The undersigned discounts Dr. Worrell's opinion.  First, as discussed above, the medical evidence does not support a diagnosis of paranoid schizophrenia.  Also, Dr. Worrell is not a psychiatrist, but a physician who specializes in internal medicine.  Second, the benign diagnostic studies and conservative treatment are inconsistent with disabling back symptoms and limitations.  Specifically, an MRI in December 2000, near the time of Dr. Worrell's assessment, showed only mild disc degeneration, with no evidence of any stenosis or compromise of the nerve roots or neural foramina.

Tr. 632.  Plaintiff argues it was improper for the ALJ to reject Dr. Worrell's assessment simply on the basis that he is not a psychiatrist.  While this might be true if that were the only reason the ALJ gave for rejecting Dr. Worrell's assessment, as clearly can be seen the ALJ gave at least one other valid reason for doing so as well.  Specifically, the ALJ noted that the assessment was not consistent with the substantial objective medical evidence in the record overall.  See Batson, 359

ORDER - 18

1  F.3d at 1195; <u>Thomas</u>, 278 F.3d at 957; <u>Tonapetyan</u>, 242 F.3d at 1149.

2  H.  <u>Other Medical Evidence in the Record</u>

3  Plaintiff argues the record shows that in the 1980s, he sought medical treatment for back

4  injuries or pain, and that he was diagnosed as having degenerative disc disease and chronic pain

5  by one medical source in 1990 and 1992.   Once more, however, the mere presence of a medical

6  impairment is insufficient to establish disability.  In addition, the period of time referred to here

7  was irrelevant to the ALJ's disability determination, as it occurred well prior to the alleged onset

8
9  of disability, and thus had little if any bearing on plaintiff's condition thereafter.

10  Next, plaintiff argues the ALJ erred in failing to discuss the late December 1999 opinion

11  of C. Schwartz, M.D., that he had chronic low back pain and stenosis, and that he was physically

12  unable to return to his past work as a logger.  An ALJ, though, "need not discuss <i>all</i> evidence

13  presented" to him or her, but must only explain why "significant probative evidence has been

14  rejected." <u>Vincent</u>, 739 F.3d at 1394-95 (citation omitted) (emphasis in original); <u>see</u> also <u>Cotter</u>,

15  642 F.2d at 706-07; <u>Garfield</u>, 732 F.2d at 610.  In this case, the vocational expert at the second

16  hearing testified that plaintiff's logging job was "very heavy work activity," while the ALJ only

17  found plaintiff to be capable of performing light work. Tr. 891, <u>see</u> also Tr. 625.  In other words,

18  the above medical opinion fails to establish or suggest any more significant functional limitations

19
20  than found by the ALJ.

21  Plaintiff further argues the ALJ signaled his antipathy for significant mental disorders by,

22  in effect, telling the medical expert who testified at the hearing that he did not believe there to be

23  much in the way of any mental functional limitations. <u>See</u> Tr. 871 (ALJ: ". . . I sent him out for a

24  consultative evaluation which was placed in the record . . . in that document I look at the mental

25  status evaluation and it appears to be fairly benign.").  But rather than showing any antipathy or

26

ORDER - 19

1   bias for such disorders on the part of the ALJ, this statement merely reflects the fact that the ALJ

2   reviewed that particular piece of medical evidence, and found the clinical findings, or least some

3   of those findings, contained therein to be largely unremarkable.  As discussed above, this is well

4   within the responsibility of the ALJ to do.

5          In addition, plaintiff argues other medical evidence in the record shows that when he was

6   incarcerated, he experienced such mental health issues that he had to be placed on the psychiatric

7   unit and needed medications to control his symptoms.  But those same records show that plaintiff

8   at times would refuse to take his prescribed medication, that such non-compliance often resulted

9   in the deterioration of his condition, and that when he did take the medication, he responded well

10  thereto. See Tr. 295, 297-98, 300-14.  Nor does the fact that plaintiff was placed in a psychiatric

11  unit or needed medications to control his symptoms alone establish the existence of significant

12  work-related limitations, particularly given, as just discussed, the good response to mental health

13  intervention he exhibited.

14         Plaintiff also argues the ALJ erred in never discussing the opinion of Marjorie Smith, a

15  consulting, non-examining opinion source,[6] who found plaintiff had a severe affective disorder,

16  but deemed that condition to be non-disabling, because it did not meet the requisite 12-month

17  durational requirement.  Again, though, this is not significant probative evidence the ALJ was

18  required to consider and address, precisely because the durational requirement was found not to

19  have been met here. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must

20  show he or she has medically determinable impairment that has lasted or can be expected to last

21  for continuous period of not less than 12 months).  That is, even though a condition is diagnosed,

22  that condition still must continue to exist and cause significant work-related limitations – which,

---

[6] Plaintiff treats this opinion source as a medical source, but it is unclear this is in fact the case, given that there is no indication anywhere in that source's opinion that she actually is one. See Tr. 327-35.

it must be noted, were not noted here – in order to be probative of disability.

Lastly, plaintiff asserts the medical expert at the second hearing testified that a person with his conditions would likely miss work regularly.  This, though, is not an accurate summary of the medical expert's testimony.  Rather, that expert testified that <u>if</u> an individual suffered from a condition where he or she simply could not get to work for up to a period of one week due to withdrawal and "essentially hiding out" from others, took his or her medications <u>and</u> did not take any drugs, then doing so – i.e., taking the medications and abstaining from using drugs – "would be helpful." Tr. 878-79.  Accordingly, even if the ALJ was required to adopt plaintiff's testimony – which he did not have to do given the adverse credibility determination discussed below – the medical expert's testimony at the second hearing actually <u>supports</u> the ALJ's determination that plaintiff improved on medication.

IV.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. <u>See</u> <u>Sample</u>, 694 F.2d at 642.  The Court should not "second-guess" this credibility determination. <u>Allen</u>, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. <u>See</u> <u>id.</u> at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  <u>Tonapetyan</u>, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." <u>Lester</u>, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>; <u>see</u> <u>also</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the

ORDER - 21

claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

The ALJ discounted plaintiff's credibility in part because the medical evidence in the record did "not fully corroborate" his allegations of disabling symptoms and limitations. Tr. 631. This was a valid basis for discounting plaintiff's credibility. See Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (ALJ's determination that claimant's complaints are inconsistent with objective medical evidence can satisfy clear and convincing requirement). Plaintiff takes issue with the way the ALJ characterized this evidence, but as discussed in detail above, the ALJ committed no error in evaluating it.

The ALJ also properly noted that a number of plaintiff's medical conditions, including both his Hepatitis C and Raynaud's disease, were controlled by medication and other treatment modalities, that the treatment he received for his back pain was "essentially conservative in nature," and that the record for the period following his release from prison showed "no regular mental health treatment or counseling" other than "prescriptions for psychotropic medications." Tr. 631; see also Tr. 627.  This too was a legitimate reason for discounting plaintiff's credibility. See Morgan, 169 F.3d at 599 (ALJ may discount credibility of claimant on basis of medical

ORDER - 22

improvement); Tidwell, 161 F.3d at 601; see also Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be suggestive of lower level of pain and functional limitation).

The ALJ further discounted plaintiff's credibility for the following reasons:

> The claimant has a history of noncompliance with medications. Despite "singing praises about his medication" in April 2004 while he was in jail, he had varying medication compliance (Exhibit 11F). At the hearing, he explained that he made those comments because he wanted to get out of lockdown. The undersigned notes that, if the claimant's testimony is true, his attempt to manipulate his mental health examiners undercuts the overall reliability of his complaints during that time. Additionally, despite numerous reports that Celexa helped control his bipolar disorder, the claimant admitted to Dr. Hwang in March 2006 that he had not taken Celexa since August 2005 (Exhibits 34F, 39F). The record indicates that he was also non-compliant with his medications during the two hospitalizations in 2006 (Exhibits 38F, 41F).

Tr. 632. Again, the ALJ properly discounted plaintiff's credibility here. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for following prescribed course of treatment can cast doubt on sincerity of claimant's testimony); see also Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility evaluation such as inconsistent statements concerning symptoms and other testimony that appears less than candid). Plaintiff argues again that one of the classic symptoms of a bipolar disorder is non-compliance with medication, but as previously discussed, there is no evidence in the record – including the testimony of the medical expert at the second hearing – this was actually the case in this matter.

Lastly, the ALJ discounted plaintiff's credibility in part on the basis that he had engaged in the following activities of daily living:

> . . . The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and

ORDER - 23

limitations.  In May 2000, the claimant wrote in his journal that, on a typical day, he woke up at 5 AM, started his day by reading the Old and New Testament and praying.  After taking his medication, he returned to his room to read something inspirational until 9 AM.  He then meditated for a short while before going to the learning center to work on typing skills.  Later that month, he reported attending a worshiping service and doing some legal research on issues that concerned him (Exhibit 10F).  Progress records from the Department of Corrections, covering December 1997 through May 2000, indicate some behavioral problems in March 2000, but document no problems in the claimant's interaction with inmates while he lived in the open population or with his mental health examiners (Exhibits 10F-11F).  In April 2002, the claimant denied having problems manipulating buttons, buckles, or an electric typewriter keyboard.  He stated that he was not working because he was unable to find work in Ketchikan that was not outdoors (Exhibit 28F/2).  In September 2003, Dr. Takaro commented that the claimant was surviving by fishing and gardening in a subsistence living situation (Exhibit AC2/1).  In April 2004, the claimant reported to Dr. Brzezinski-Stein that he lived with his wife, drove a car, was independent in all activities of basic self and home care, cooked, and shop [sic] for groceries.  Although he stated that his social functioning was limited, he admitted that he had a few friends, whom he interacted with on a regular basis. (Exhibit 32F).  Examiners have also found the claimant to be well-mannered, courteous, friendly, and cooperative during evaluation (Exhibit 32F, 34F).  Although the claimant got divorced in October 2005, he reported in June 2006 that he was living in an apartment with his girlfriend (Exhibit 34F/2).  Furthermore, at the hearing, the claimant testified that he did laundry, cooked, watched television, attended some public events, including car shows during the summer, shopped for groceries at a nearby Safeway every two weeks, and occasionally spent time with his mother and son.  He reported that he moved to Washington state in 2005, and that, prior to that time, he was a volunteer fireman in Alaska.  He stated that he was a safety officer and that he conducted two training sessions per year on CPR and first aid, lasting about three to four hours.  He testified that he went to a fire scene twice per year and that the volunteers met about once per month during the warmer months for five to 20 minutes.

Tr. 630-31.  Here, too, the ALJ did not err.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities.  See Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities

ORDER - 24

may not be easily transferable to a work environment." Id.  While not all of the activities listed by the ALJ above may indicate an ability to perform them for a substantial part of the day, others – particularly the gardening, fishing, performance of household chores, and self-report about not being able to work due to the inability to find a job indoors – do so, or at the least are indicative of activities that are transferrable to a work setting.

V.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id.  However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, the ALJ assessed plaintiff with the following residual functional capacity:

**. . . [T]he claimant has the residual functional capacity to lift/carry 20 pounds, stand/walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  He can frequently balance and occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and**

**scaffolds.  He should never stoop.  He can frequently handle, finger, and feel.  He has limited hearing and needs to wear a hearing aid.  He should avoid concentrated exposures to extreme temperatures and vibration.  In terms of mental functional capacity, he can perform simple, repetitive work.**

Tr. 625-26 (emphasis in original).  Plaintiff argues the ALJ's RFC assessment ignores medical evidence in the record for which inadequate reasons were given for rejecting.  But as discussed above, the ALJ did not err in evaluating the medical evidence in the record, and thus he did not err in assessing the above residual functional capacity.  Plaintiff also takes issue with the fact that the ALJ assessed the above RFC for the entire period of alleged disability at issue in this matter, even though his "health profile reflected changes during" that period. (ECF #16, p. 13).  Plaintiff, however, has failed to show that any such changes were of a disabling nature or more significant than found by the ALJ in this case for the requisite durational time requirement.  Thus, there was no error on the part of the ALJ in assessing one RFC for him.

VI.    The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do.  See Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids").  See Tackett, 180 F.3d at 1100-1101; Osenbrock, 240 F.3d at 1162.

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ.  See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See

ORDER - 26

Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the second hearing, the ALJ posed a series of hypothetical questions to the vocational expert containing a number of functional limitations, including several that were substantially the same limitations as those that were included in the ALJ's assessment of plaintiff's residual functional capacity. See Tr. 823-95.  In response thereto, the vocational expert testified that an individual with the functional limitations reflected in the ALJ's RFC assessment – and who had the same age, education and vocational background as plaintiff – could perform the two jobs of bakery helper and bottling machine attendant.[7] See Tr. 891-95.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. See Tr. 636-37.

Plaintiff argues the ALJ failed to articulate specific functional limitations upon which he relied to make his step five determination.  But as just discussed, the ALJ did so based on those limitations he included in his assessment of plaintiff's residual functional capacity, which formed the basis of those contained in the hypothetical questions posed to the vocational expert, as well as on plaintiff's age, education and vocational background.  Plaintiff next argues the ALJ failed to include all of the relevant functional limitations in the hypothetical questions he posed.  Once more, though, because the ALJ properly evaluated the evidence in the record, and thus properly assessed plaintiff's RFC, he was not obligated to include any additional functional limitations in the hypothetical questions he posed to the vocational expert.

---

[7] The vocational expert further testified that there were other categories of jobs plaintiff could perform as well, but did not specify what those categories would be. See Tr. 894.

ORDER - 27

Citing to the decision of the first ALJ in this case, plaintiff further argues the two jobs the vocational expert identified that he could perform both require handling food products, therefore precluding him from performing them due to his Hepatitis C.  The ALJ in that previous decision concluded in relevant part as follows:

> . . . [T]here are jobs, existing in significant numbers in the national economy, which the claimant is able to perform.  In response to the interrogatories completed by [the vocational expert], the claimant argued that he could not obtain a food handler card with hepatitis C.  This seems reasonable.  However, I conclude that the claimant could still perform the jobs of copy messenger, routing clerk, or check casher. . . .

Tr. 679.  That vocational expert, however, never actually opined or testified that plaintiff would not be able to perform a job handling food due to his Hepatitis C. See Tr. 162-163.  As such, it is not entirely clear on what the prior ALJ based his conclusion here.  Accordingly, while it may be that an individual diagnosed with Hepatitis C would be precluded from such work, there is no reliable evidence in the record that such is indeed the case, or that someone who has Hepatitis C that is entirely or largely controlled, as in this case, would be so precluded.  The Court, therefore, finds the ALJ did not err in determining plaintiff could perform the above two jobs.  Finally, as noted above, the vocational expert further testified that there other categories of jobs existed that plaintiff could perform, although he did not specify what those were. See Tr. 894.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly concluded plaintiff was not disabled, and therefore hereby affirms the defendant's decision to deny benefits.

DATED this 4th day of January, 2011.

Karen L. Strombom
United States Magistrate Judge

ORDER - 28